Case number 22-1236, United States v. Leron Liggins. Argument not to exceed 15 minutes per side. Mr. Fink, you may proceed for the appellant. Thank you, Madam Clerk, and good morning Judge Moore, Judge Mathis, Judge Clay. Very nice to see you in person. Your Honors, I'm going to focus on the first two issues in my brief, but of course, what's most important to me is what's most important to you, so if I can answer any questions on any issues, I'd be grateful if you asked the questions that you had. I, on a self-indulgent personal note, enjoy coming to this court and being in this building because our institutions and these Article III courts have not just power, such power, but have done right by society and the participants in the system for centuries. The reason, though, that our Article III courts are successful in that regard, from everything from defending democracy to giving a fair trial in a felon in possession case, is the faith people have in those institutions, and that can be at any level or any seriousness of a case. But even a run-of-the-mill, so to speak, case like this, and frankly, many of the cases that district courts see on a day-to-day basis, courts' interactions with its participants are fundamentally important to the success of the judiciary, the faith that people have in the courts to do right by its participants, and that goes for defendants, that goes for victims, government, and civil parties. In this case, the word choice and the admonishment given by a district court judge to a criminal defendant in this case for doing nothing other than what he was lawfully and constitutionally allowed to do, asking for new counsel, demanding a trial, raising issues about discovery, which he turned out to be right about. Admonish that defendant as looking like a criminal for doing so. You look like a criminal to me. This is what criminals do. This isn't what innocent people do who want a fair trial. And I think that regardless of what's inside of the trial judge's head or heart, for all I know in my interactions with Judge Murphy, there was no ill intent, and there's certainly nothing that would indicate that there's actual bias from my knowledge, but the standard is not that. It's what the participants in the pews, the participants watching, reading these briefs, the prison letters that I get who have read these briefs about their interactions with the courts, that is what matters, the appearance of justice, because it's every bit as important as actual justice. And you have to show that the district judge had a deep-seated antagonism. Is that right? I think, Judge, Latikki articulates that standard. If we're talking about something that's not extrajudicial, that the standard becomes a deep-seated animosity. I think that that is one standard by which, and Latikki announced, to judge this case. Explain how the comment meets that status. Sure, Judge. I think because we're looking from an objective standard, objective observer standard, of what a reasonable man, should he know all the facts of the case, were to observe that comment, would he feel that the judge was fair. In that context, and then using the standard, the correct standard from Latikki, I think that when you have a criminal defendant who's cloaked in the presumption of innocence, come before a United States District Court judge with American Eagle and the federal seal behind him, tell him he looks like a criminal, and tell him he's not a criminal. For someone who doesn't have interactions with the justice system, that could be based on his race, that could be based on just the fact that he's in a brown jumpsuit from FCI Milan, I don't know. But I know that the casual observer, and I know that my clientele in the Eastern District of Michigan, and I know that the reasonable man standard, I think I'm a reasonable man, I think my clients are reasonable people in the community, would view that comment as the judiciary having a bias against someone who hasn't been convicted of a crime. Well, what about the fact that the judge, when the motion to recuse was filed, the judge apologized and completely said, I was wrong, I was mad, I shouldn't have done that, and then, arguably, a fair trial occurred afterwards. How do we deal with that feature? So two answers to that, Judge. As a threshold answer, I would say the problematic nature of the apology was the misstatement of the record of what actually occurred, and then another error in announcing what the standard is, a very basic principle of a criminal case, that a defendant has to prove nothing. So during this apology in which Judge Murphy talked about Laticki and apologized for his anger, he also said that he's going to give the defendant the right to prove he's innocent, to prove his lack of guilt. So with all that time, a year, to reflect on whether or not that's something that should have been said, whether he truly was apologetic, he still couldn't get the standard right. And I think that's problematic for a reasonable observer. Now, the second part of that answer... I recognize the argument that the government makes, it's a reasonable one, that there's no indication in the record that there was some sort of prejudice or some sort of bias, from the evidentiary rulings, from the jury instructions, as you just mentioned, Judge Moore, there's no indication of that. But, importantly, there's no indication that there was some sort of bias. And I think that's a good segue into the second part of that answer. That's not the standard for a reason. Now, that could be evidence of whether there was actually deep-seated antagonism, as Judge Mathis raised, I grant that. But as to the standard of what the subjective person would see from that statement, what happens actually in practice, whether he's actually biased or not, is an irrelevant part of the analysis. So I would say, Judge Moore, that the important part of this is not so much figuring out what was in Judge Murphy's mind. In fact, Judge Moore, it might have inured to my client's benefit. He may have sentenced him to less because he felt bad. I don't know that answer. It may have benefited him. But, again, whether it benefited him or not, the standard is what our community, who interacts with that court on a daily basis, views as being fair. And can it rely on the court to do the right thing? And I think when you start eroding that, when you start telling people in the court that they look like criminals because they're using every tool at their disposal to defend themselves, I think that has a corrosive effect on the faith in our systems. And that's why I started with such a broad, sweeping statement. Should your client have moved for recusal earlier? In other words, right after those comments? Because it was 20 months later, and it was on the eve of trial, that the motion was filed. Judge, I probably would have done it there if I was trial counsel. I don't think this court, based on my briefing and the way I speak, would have hesitated to make my feelings known about it. So would I have done it differently? Yes. From a procedural standpoint, when it's structural error, as here, as I described in the brief, it can't be untimely. Would it have been better practice? I think so. And we don't have a record, really, to tell us, was the client asking in between lawyers for this? It certainly appears from the late hour filing that Mr. Liggins insisted upon the motion. I mean, that's written explicitly into the motion. So we don't know how long he was asking for that, whether there was hesitation from the lawyers. But I don't think it's subject to an ineffective analysis or anything like that, because if you agree with me that the comment was constitutionally impermissible, then it's structural error that can't be cured. What case do you rely on to say it's structural error? Sure, Judge. Judge, I'll start by quoting from Washington v. Requineco, 548 U.S. 212. It is beyond dispute that judicial bias is structural error, not susceptible to forfeiture or harmless error analysis. That's also quoted in Sullivan v. Louisiana, 508 U.S. 275, 1993. Judicial bias is a structural defect, both when the bias is actual and when it's merely unconstitutionally probable. That's Coley v. Bagley from this circuit, 706 F. 3rd, 741. So I recognize the timeliness issue. I think I would have done it sooner, Your Honor, as a practical matter. But I think that whatever you conclude the proper analysis is with regard to that comment, I don't think the timeliness will be part of that analysis, if you find it in our favor. Unless there's further questions on the bias, I'm going to briefly, with these last couple of minutes of my affirmative argument, address the wiretap issue. And if there's any other questions about the other issues, please ask them. The fact that the comment took place prior to trial and not during the trial, does that ameliorate some of the harm here? It's a good question, Judge. I mean, I think, actually, I think I would probably say that it cuts the other way, Judge Mathis, because in pretrial situations, when you have the benefit of being thoughtful and deliberative about where you are in a case, I mean, when you take the bench in a pretrial, you know the procedural posture, you know the issues that are in play. And to make those comments in a situation where you're not on the spot making evidentiary rulings, listening to witnesses, I mean, you could be in a trial with really horrible evidence of horrible acts, and that might raise passions. It might be more understandable. So I think it's actually more problematic that in a pretrial setting, we got a window into this judge's thinking about my client when he admonished him pretrial. So no, I think it could be reasonably argued either way, but I don't think it affects the analysis here, because again, I just hope this court will think of the average person in the Eastern District of Michigan watching this case, decided to come into court and watch that case, and watch this defendant standing next to his lawyer be told he looked like a criminal because he was exercising his constitutional rights, regardless of when that happened, Judge Mathis. Briefly, and I always run on as much longer than I thought I would, the wiretap issue, Your Honors, procedurally, it's unique and a bit messy, because procedurally, prior counsel did not bring a motion to suppress. This, for the court's benefit, is the government admitted there was an unlawful Title III wiretap in the state of Arizona of one of the witnesses who testified at the case, and it was in a Rule 33 motion that trial counsel raised this. There is a narrow ground of relief that you can grant with terms of the wiretap. I'm going to run out of time. Judge Moore, can I just finish this thought? There is a narrow ground of relief that you can grant that solves the unique and kind of problematic procedural posture that we're in, and the government spends quite a bit of time on in the brief. I'm asking you to vacate the Rule 33 order, denying a new trial, and order the judge to have an evidentiary hearing. That doesn't vacate the conviction, doesn't vacate the sentence, but it cleanses what I view is the biggest problem with the wiretap, Your Honors, in that we never got a hearing and we don't have a record. Did you ask for a hearing at the trial court? So the trial counsel made a Rule 33 motion, and there's no explicit request. However, there's a local rule in the district that makes it a default rule to have a hearing on a Rule 33 motion, and the judge, Judge Murphy, expressly made a ruling that he wasn't ordering an evidentiary hearing because he found the issues to be simple. So the fact that he contemplated the request, I think, allows this court to know what the ruling the lower court made. That's why, obviously, we require parties to ask. You want the district court to resolve it first. Well, he did, and he said that a hearing wasn't required because it was a straightforward issue, which it wasn't, because, as I'll discuss on rebuttal, we don't know the record of what was used at trial or not, and we need one. Thank you. I'll see you in a moment. Good morning. My name is Erin Shaw, and I represent the United States. I'm also going to begin with the recusal question, and I'm going to pick up on Judge Mathis's question about deep-seated and unequivocal antagonism that would render fair judgment impossible, because on this record, in this case, we don't have evidence of that for really four main reasons. First, the district court, in the months prior to the problematic hearing, demonstrated a lot of patience and accommodation of Mr. Liggins as he was asking for things like a preliminary pre-sentence report so he could consider whether or not he wanted to plead or go to trial. The district court allowed him to kind of punt on his Rule 20 transfer from Kentucky and consider if he wanted to have a global resolution. He didn't make him plead immediately. He let him fire his retained lawyer, Mr. Evans, when he wanted to. He let him have a new CJA-appointed lawyer when he wanted to. So the judge, up to the point of that hearing, really was very patient with this defendant and allowing him to have many different accommodations and things that he asked for. Now, he lost his temper, no question, at that January 2020 hearing, but the standard for analyzing that isn't just did he say something regrettable or even in the judge's words, did I say something stupid? It's expressions of impatience or dissatisfaction or annoyance or even anger are things under Litkey that are allowable if they don't demonstrate a deep-seated and unequivocal antagonism. But here the comment is, this guy looks like a criminal to me. This is what criminals do. So it's prejudging the defendant and saying he is a criminal. Well, I appreciate that that's what the words are, but when you look at the context of what they're said, he's talking about the way the defendant was acting and the things that he was doing, because the judge thought that the defendant was playing games and giving him the runaround after he had made all these accommodations and that one minute he wants to go to trial, the next minute he wants to plead, then he wants to go to trial again, then, oh, maybe I'll get a new lawyer, and I think he just thought it was gamesmanship. But the conduct is what he was saying was problematic, not that the defendant physically looked like a criminal or that he... But he said, this guy looks like a criminal to me. And we can't escape the fact that Mr. Liggins is black and the judge is white, right? No, that's true, but he's talking about the way the defendant is acting. I think that's clear from the context. In the beginning of that hearing, it's about a 10-minute hearing. The transcript's only about five or six pages, but he's talking about actions and activity, not how the defendant looks, but that he thinks he's playing games, he's misleading the court because, you know, does a Rule 20 transfer from Kentucky and says, I want to plead, and that pleading, and then pulls back and says, oh, no, I don't anymore. So I don't think he was talking about his physical appearance. Your opponent presents it as what Mr. Liggins was doing was exercising his various constitutional rights, and that this is what sort of caused the district judge to blow up. Do you think that that's a fair portrayal? I don't, because this is a case where, especially given that we've got this Rule 20 transfer issue, the defendant had already signaled by asking that his case be transferred. I want to plead guilty to that case. So it was already really teed up by this defendant that he was headed down that road. And if he wanted to go to trial, that's just fine. We look back to the September of 2019. There was a final pretrial conference where Mr. Arnone was, at that point, the defense attorney. And they have a very reasonable and pleasant final pretrial conference where they're getting ready to pick the jury. They're talking about the various housekeeping issues. It goes just fine. Isn't this something that not typically happens but happens pretty regularly where you have a defendant that either wants to go to trial and then changes his mind and says he wants to plead guilty at the last minute or intends to plead guilty and then changes his mind and wants to go to trial? Isn't that something that's pretty typical? It is, but in this case it happened multiple times. And then we also have the different issue of mixing in attorneys with that same experience. So I think the problem that Judge Murphy saw here was that it looked like gamesmanship to him, not I do want to go to trial. That's my constitutional right. He thought it was runaround and gamesmanship. And that's really where I think the judge lost his cool over that issue, not how Mr. Liggins looked or that he already had decided he was a criminal. It's that this guy's playing games with me, and I don't think that's appropriate. So following up on that, he does apologize, which I think is an important fact in the case. And really his words are pretty powerful. You know, I want to say right now directly to Mr. Liggins, I am sorry, I apologize. And then he criticizes himself. Was I imperfect? Was I mad? Was I stupid? Yes, I made a mistake. I regret it. And I apologize. So after he had some time to cool off, I think he did come around to the realization that that was not okay, the way the hearing went. And he wanted to, I think in his own words, clear the air and get them on the right path. What about during that apology, the district judge misstating who has the burden of proving guilt and saying you will have a chance to show your innocence? Well, he did absolutely get that wrong. That's not the standard, of course. But it's important to note that he did get it right in front of the jury. And they had had voir dire earlier that morning where they talked about Fifth Amendment rights. And the judge, in questioning jurors and making sure they were suitable to serve, made sure that they understood that Mr. Liggins did not have to put on a case, did not have to testify. And then every other time that those instructions were given before a closing argument and preliminary instructions, he got the standard right. So he misspoke, but I don't think that that is evidence of deep-seated antagonism against this defendant. What about the idea that the appearance of impartiality is important and that sending a message that district judges should not lose their cool, should not make these kind of statements, is important for the appearance of justice? Well, it is important for the appearance. But I think looking at the appearance, we have to look at the appearance over a four-year window, not in one hearing into a five-minute exchange. And from beginning to end, we have a judge in the beginning who was, as I said when I started, very accommodating of this defendant. We have a bad hearing and a bad day. But from there and after, he apologizes. He says he's going to get it right. He does get it right. And he, as a trial judge, should look at that trial record and say, did this defendant have a fair trial? The record shows that he did. So the appearance of impropriety, if you look at it in full context from beginning to end here, I think it appears that Mr. Liggins did have a fair trial. How is this, the comment here, if you look at the Leike case, it references a comment in the Berger case where I think the trial judge said that essentially German-Americans are disloyal. And in Leike, the court found that that would have required recusal. How is the comment here different than the comment there? Well, I think in that case, the judge had already made up his mind about a whole group of people and said we're suspicious of these German-Americans from World War I and anybody who comes in is going to have a problem. That's not what we have here. We have a district judge who was concerned about the way that Mr. Liggins was playing games, and there wasn't a suggestion in that case that the defendants were playing games or misleading the court or doing anything frustrating. It was just a blanket assertion of an entire group, and that's not what our record shows. It shows frustration with a defendant, and just the judge was exasperated over, I think, he tried to give him all the things that he wanted along the way and he still wasn't content. So it was more of a gamesmanship issue in our case, and I don't think we see gamesmanship in the case that you're talking about, Judge Mathis. What about your opposing counsel's argument that the case law requires us to regard what occurred as a structural error? Is it a structural error or what occurred there with Judge Murphy or not? Well, I think even if you think that it is, we still look to see whether fair judgment was impossible, and I don't think on this record that it was because we can see the way that the case played out that Mr. Liggins got a fair trial. Are you agreeing, though, that it's structural? No, I'm certainly not agreeing that it's structural. Well, he cited like three cases. How do you respond to those? Well, I would say that I think the reason he's saying it's structural error is to say that there's no harmless error analysis, and I'm not offering a harmless error answer to the case. I'm just saying that I don't think here when you look at the integrity of the context of the back and forth between the judge and the defendant that this was a structural error. Do those cases say that improprieties of this nature from the judge do constitute structural error? I'm not sure. I think they're more general structural error cases. I don't think that they address the issue in our case. Are there any additional questions on the recusal issue? No. Seeing no questions, I'll move on quickly to the point that Mr. Fink made about the suppression issue. It's an interesting approach from the defense to take a motion for a new trial and say, oh, I want to have a do-over on an evidentiary ruling because I missed it before and I should have moved. But here I think the judge's decision not to have an evidentiary hearing when the defendant did not put an issue of fact to play on the causation issue is really the most important issue from the DeHaven-Murphy testimony. He starts off his motion by saying that on information and belief, DeHaven-Murphy was caught because of the wiretap in Arizona, but on information and belief is not really enough to tee up an issue. How would a defendant know that DeHaven-Murphy was caught up only through the wiretap and that everything else then would be the fruit of the poisonous tree? Well, there I think we have to see how it plays out. So he suggests this, and he also says, I didn't get the discovery, and if I had the discovery, I would be able to show you. And so the government comes back and says, well, you do have the discovery, and it's not what it shows. It shows that there was an independent source. So at that point, I think it's incumbent upon the defendant to dispute that in some way. There were two witnesses testifying. DeHaven-Murphy, the government's statement is that it was a tip from a confidential source. Is that right? Yes. So was it disclosed to the defendant who the tip was from? The person? No, it was not. So how would the defendant be able to challenge that then? The government hypothetically says, oh, yeah, this witness is free of the taint of the illegal wiretap because somebody else told us about the witness, but we're not going to tell you who that somebody else is. How can a defendant respond? Well, here, I think for starters, they just say, we think it's this. So the government comes back and, you know, we have testimony from the case agent that says, no, that wasn't how it was derived. So there is a case agent who testifies at some point that says, I got the info from a confidential informant. Is that right? Yes, but he's talking about another person. The case agent was not the person who received the tip. It was another. So how can the defendant probe that statement? I'm just thinking practically that it seems like the government has all the cards in their hand, that you say, well, it was a tip from a confidential informant. You should have inquired further. But how can the defendant inquire further? What should the defendant specifically have done? Well, he's saying the discovery is going to show, back to causation, the discovery is going to show that they're linked. And the government response is, no, it doesn't show that because it's not true. But why does the district judge have to believe the government? It doesn't have to believe the government, but that's the only evidence that it had in front of it about where did this come from. And my question is, how can the defendant get more evidence? I'm just thinking, what could the defendant's lawyer have done to get evidence? Ask to depose the government agent who says that there was a confidential source. Is that something that could have been done? Or say, you must name the confidential source. I'm sure the government would say, no, no, no. We can't name the confidential source because it's confidential and it will jeopardize other prosecutions or something like that. So it seems to me that the defendant's in a total bind here. I don't know that I agree because also we look at the timing. This is a motion for a new trial where he's saying this evidence shouldn't have come in. Right. So if the motion had been made at an earlier time, is there some information that the government would have provided that would have demonstrated the independent source of the information on DeHaven Murphy? Well, I think that they would have needed to maybe push that further, but that they didn't, and that's one of the issues. So it's a timing problem then. In large part, I think it is, and I think the way that it's happened here it sort of writes Rule 12 out of existence that we have a trial and then we don't like how it went, so we're going to call back and say, what about that evidence that shouldn't have come in before? And they had an opportunity to raise it at the right time and didn't. And did you raise that objection when the new trial motion was filed in your response? We did not. I know. Yeah. I know. Forfeiture of a forfeiture. I know. I know. I have seven seconds left. Are there any additional questions I can answer for the court? No. Thank you. I ask that the judgment be affirmed. Thank you. Your Honors, briefly, and just on both points, if there's anything I can clarify, I'm happy to do so. Ms. Shaw argues about accommodation and patience when talking about the pretrial proceedings and why that shows there wasn't this deep-seated animosity. You should show accommodation and patience to defendants who are on trial for their lives. That's precisely what's expected of a district court judge when you put on the black robe. These weren't requests that were anything other than procedurally proper, constitutional, and well within his rights to ask for. If he wanted to deny his request for a new attorney, the trial judge, he can do it under the proper standard and rule accordingly. Showing accommodation and patience and then getting frustrated because you're being asked for different things does not justify the colloquy that was engaged in. If he thinks it's gamesmanship, Judge Murphy, then deny the motions for that reason. So obviously Judge Murphy recognized later on that he had been excessive and improper in his comments, and so he apologizes. So are you basically saying then that any time a judge makes a significant error by the kind of statements that were made here, the judge should take himself off the case? I appreciate that question, Judge Moore, and let me unequivocally say no. And I have this note and the question perfectly is the answer for that. You asked me earlier about the apology, and I failed to say this. There's a real lack of credibility in an apology that misstates what actually happened. To be sorry and remorseful for something and to reflect on it and say that's not me, that's not what I intended, I was mad, to recite the facts of what happened in that January hearing wrongly, it's hard to give an apology with credibility. He says that he was fine when he started the hearing and it was Mr. Liggins that went on a colloquy with the court that made him mad. That's not at all what happened. The judge came right out of chambers saying I got a problem with this guy. So it's hard to apologize, Judge, when you misstate the record. Now, I understand Ms. Shaw's argument that he was maybe referring to another hearing, but that's a problem too because, again, I think there's a lack of credibility in the apology in that regard. Two things on the second point, Your Honors. First, on the structural error issue, Judge Moore. I think where we're missing each other is Ms. Shaw just thinks it's not an error. But if this court finds that that comment was an error, was unconstitutional and judicial biased, then it must reverse. I mean, that's the structural error portion of it, whether there's an error. And were those cases involving judicial recusal? Yeah. The one that I cited in particular, the Washington v. Requenco, and I'm quoting, and, Judge, if I could just finish this thought as I see the red light. It is beyond dispute that judicial bias is structural error, not susceptible to forfeiture. That's a direct quote from Washington. Thank you. You're welcome. And, Your Honor, the last thing I'll say, if I may, Judge Moore, and I promise this is the last sentence. One sentence. The practical answer to all of these questions about the wiretap is an evidentiary hearing, and we don't even have to vacate the conviction. But you didn't ask for an evidentiary hearing specifically. Judge ruled on it, Judge Moore, but I recognize that. Thank you, Your Honor. Thank you. Thank you both for your argument. The case will be submitted, and the clerk may call the next case.